Jeffrey S. Bolender (SBN 174423)
**BOLENDER LAW FIRM, PC**
1370 Valley Vista Dr., Suite 200
Diamond Bar, CA 91765
Telephone: 310-320-0725
Facsimile: 424-320-2642
Email: jbolender@bolender-firm.com

Attorneys for Plaintiff,
THE HAVEN AT VENTURA, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE HAVEN AT VENTURA, LLC, | Case No.:  2:22-cv-01284 |
| Plaintiff, | |
| vs. | **COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** |
| GENERAL SECURITY INDEMNITY COMPANY OF ARIZONA; WESTCHESTER SURPLUS LINES INSURANCE COMPANY; ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY; CERTAIN UNDERWRITERS AT LLOYD'S, LONDON KNOWN AS SYNDICATES QBE 1886, ADV 780, BAR 1955, MSP 318, TMK 510, and TMK 1880; and DOES 1-20, inclusive, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff, THE HAVEN AT VENTURA, LLC, brings this Complaint for Declaratory Relief and Damages against Defendants, and each of them, and alleges upon knowledge as to its own acts, and upon information and belief as to the acts of all others, as follows:

## STATEMENT OF THE CASE

1.  Plaintiff is the owner and operator of the Haven at Ventura—a 231 unit luxury residential community in downtown Ventura, California. To protect against a broad variety of construction risks during the construction process, Plaintiff procured builders risk insurance affording first dollar property coverage for Plaintiff and all contractors at every tier. Builders risk insurance is property insurance that covers projects under construction, renovation or repair, and it insures against accidental losses, damages or destruction of property for which the insured has an insurable interest. The purpose of builders risk insurance is to compensate for loss due to physical damage or destruction caused to the construction project itself.

2.  During the course of construction, as alleged more fully herein, Plaintiff discovered losses falling within the scope of coverage of its builders risk insurance. Consistent with policy conditions, Plaintiff promptly investigated the nature, cause, and scope of the losses; hired qualified consultants to perform inspections, testing, and investigation of the losses; worked with those consultants to formulate and implement a remediation and reconstruction plan; provided oversight during the implementation of the plan to ensure the shortest possible delay in completion of the project; reported all losses to its insurers promptly and

provided physical access and relevant documentation.

3. Defendant insurers, the "Underwriters," denied coverage for losses caused by mold; losses caused solely by water; and losses resulting from a delay in opening the project. As to water losses and mold losses, the Underwriters assert an exclusion for mold damage precludes coverage for all such losses, even though water damage is explicitly within a separate sublimit. The Underwriters further deny coverage under a $1 million coverage extension for mold damage, speculating that one of two excluded causes constitutes the efficient proximate cause of loss—namely, "dampness of atmosphere" or "faulty workmanship." During the investigation, the undisputed physical evidence revealed that "dampness of atmosphere" was not a cause in fact of the losses.

4. The builders risk insurance contains no provisions whereby "faulty workmanship" is an excluded cause. The Underwriters assert a policy provision entitled "Cost of Making Good" (COMG) functions as a broad exclusion for any damage caused by faulty workmanship. In fact, Plaintiff is informed and believes the COMG is well known to the Underwriters, and each of them, and that the actual function of such contractual language—derived from forms developed by the London Engineering Group c. 1996 and used widely in Europe and Canada—is directly contrary to the stated rationale underlying the denials of coverage.

5. The coverage position of the Underwriters regarding COMG is not objectively reasonable based on its language, the known history of the intent and purpose of such contractual provisions, published and unpublished interpretative case law, secondary authorities, etc. Plaintiff contends the Underwriters are specifically and unlawfully motivated to deny coverage, because a covered water loss or mold loss triggers the additional insurance protection afforded for a

delayed opening. Plaintiff has submitted to the Underwriters all documentation showing its losses, and it has repeatedly asked the Underwriters to reconsider their denials of coverage and engage in a meaningful dialogue to avoid litigation. Plaintiff contends the Underwriters have failed to do so, compelling Plaintiff to seek its legal  remedies in this Honorable Court.

## **PARTIES**

6.  At all times relevant to this Complaint, Plaintiff, THE HAVEN AT VENTURA, LLC, hereinafter "Plaintiff," is, and at all relevant times mentioned herein was, a South Carolina limited liability company, whose principal place of business is located in the County of Ventura, State of California. Plaintiff brings this action in its capacity as owner of the Project, and as alleged more fully below, as the sole agent of each and every insured under the contracts of insurance at issue in this action.

7.  On information and belief, Defendant, WESTCHESTER SURPLUS LINES INSURANCE COMPANY, is, and at all relevant times mentioned herein was, a corporation organized under the laws of the State of Hawaii, whose principal place of business is located in the State of Georgia.

8.  On information and belief, Defendant, GENERAL SECURITY INDEMNITY COMPANY OF ARIZONA, is, and at all relevant times mentioned herein was, a corporation organized under the laws of the State of Arizona, whose principal place of business is located in the State of New York.

9.  On information and belief, Defendant, ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY, is, and at all relevant times mentioned herein was, a corporation organized under the laws of the State of Delaware,

whose principal place of business is located in the State of New York.

10.     On information and belief, the Defendant, TMK 510, is a corporate-owned Lloyd's syndicate, and Tokio Marine Kiln Syndicates Ltd. is the sole member of the syndicate, providing 100 percent of its capital. On information and belief, Tokio Marine Kiln Syndicates Ltd. is organized under the Laws of England & Wales, and has its principal place of business in London, United Kingdom.

11.     On information and belief, the Defendant, TMK 1880, is a corporate-owned Lloyd's syndicate, and Tokio Marine Kiln Syndicates Ltd. is the sole member of the syndicate, providing 100 percent of its capital. On information and belief, Tokio Marine Kiln Syndicates Ltd. is organized under the Laws of England & Wales, and has its principal place of business in London, United Kingdom.

12.     On information and belief, the Defendant, QBE 1886, is a corporate-owned Lloyd's syndicate, and QBE Underwriting Limited is the sole member of the syndicate, providing 100 percent of its capital. On information and belief, QBE Underwriting Limited is organized under the Laws of England & Wales, and has its principal place of business in London, United Kingdom.

13.     On information and belief, the Defendant, ADV 780, is a corporate-owned Lloyd's syndicate. Advent Capital Holdings is the sole member of the syndicate, providing 100 percent of its capital. On information and belief, Advent Capital Holdings Limited is organized under the Laws of England & Wales, and has its principal place of business in London, United Kingdom.

14.     On information and belief, the Defendant, BAR 1955, is a corporate-owned Lloyd's syndicate, and Arch Insurance (UK) Limited is the sole member of the syndicate, providing 100 percent of its capital. On information and belief,

Arch Insurance (UK) Limited is organized under the Laws of England & Wales, and has its principal place of business in London, United Kingdom.

15.     On information and belief, the Defendant, MSP 318, is a corporate-owned Lloyd's syndicate, and Beaufort Underwriting Agency Limited is the sole member of the syndicate, providing 100 percent of its capital. On information and belief, Beaufort Underwriting Agency Limited is organized under the Laws of England & Wales, and has its principal place of business in London, United Kingdom.

16.     Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES, 1-20, inclusive, and therefore sues each of them by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities at such time as they are ascertained by Plaintiff.

17.     On information and belief, Plaintiff alleges that each fictitiously named defendant is now, and was at all times mentioned herein, the agent, principal, partner, joint venture, employee, or alter ego of the remaining defendants, and that all of the acts and conduct alleged herein were performed within the course and scope and in the furtherance of such agency, partnership, joint venture, employment, or alter ego relationship.

18.     On information and belief, Plaintiff alleges that in engaging in the wrongful course of conduct and in committing the wrongful acts and practices complained of herein, defendants, and each of them, acted in concert together and knowingly and willfully conspired with and agreed among themselves, and aided and abetted the others, to further their own economic interest at the expense of the economic interests and business security of Plaintiff.

## JURISDICTION AND VENUE

19.     This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, subd. (a). Complete diversity exists between the parties, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs— collectively as to all defendants and individually as to each defendant based on its respective risk participation.

20.     The defendants, and each of them, are subject to personal jurisdiction in this Court because they transact business in the State of California and/or have entered into one or more contracts of insurance with Plaintiff to be performed in the State of California. The defendants also each agreed in their contracts of insurance to submit to the jurisdiction of a Court of competent jurisdiction within the United States.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, subd. (b)(2) because a substantial part of the events or omissions giving rise to the claims for relief alleged herein occurred within this District, and pursuant to Section 1391, subd. (c)(3) because certain defendants are not residents of the United States.

22.     The contracts of insurance at issue in this action (also referred to herein as insurance policies and insurance products) apply to business operations, real and personal property, insured risks, and related contingent perils within the State of California, and therefore, the disputed contractual language is governed by California law pursuant to Section 1646 of the California Civil Code; and the claims-handling disputes are governed by the common law of California, including the implied covenant of good faith and fair dealing; relevant provisions

of the California Insurance Code including Section 791.01 et seq.; and the Fair Claims Settlement Practices Regulations set forth in Title 10 of the California Code of Regulations. 10 CCR §§ 2695.1-2695.14.

## **THE PROJECT**

23.     The Haven at Ventura (the "Project") is a 231-unit luxury residential apartment community located in downtown Ventura, California located along a bluff overlooking the 101 Freeway and Pacific Ocean. The Project comprises ten residential buildings using a mix of 2-, 3-, and 4-story building elements and three building types (i.e., mansion, stacked dwelling, and commercial block). The Project also includes a 2-story central community building featuring a resident lounge, fitness center, yoga room, clubhouse, game room, sunset terrace, and outdoor swimming and spa area.

24.     Plaintiff entered into a "Construction Contract"—AIA A102-2007 Standard Form of Agreement Between Owner and Contractor dated July 12, 2018—with Hill Contractors 1 ("Hill") for construction of the Project and completion of the work set forth in the Construction Contract. Hill later entered into subcontracts with dozens of subcontractors to perform various scopes of work required by the Construction Contract.

25.     On information and belief, Hill entered into subcontract with: (a) Sound-Crete Contractors, Inc. (provision and installation of gypcrete subflooring on the buildings 2nd, 3rd, and 4th floors); (b) Residential Design Services (provision and installation of carpet, tile flooring, and vinyl plank flooring and base); (c) Cabinets 2000 LLC (fabrication, assembly, and installation of kitchen and bathroom cabinetry); (d) Color Concepts Drywall & Painting (installation and

texturing of interior drywall); and (e) Spectra Painting Company Inc. (preparation and painting of all residential unit interiors). The work of these subcontractors was to be managed, sequenced, coordinated, and supervised by Hill. While Hill and these subcontractors performed work in all buildings at the Project, the work of Hill and these subcontractors in Buildings 4, 6, 7, 8, and 10 is at issue in this action.

## THE CLAIM

26.    By September 2020, Buildings 4, 6, 7, 8 and 10 were at various stages of completion, but none of these buildings had received final acceptance from the City of Ventura or Plaintiff. In or about September 2020 and October 2020, Plaintiff's ownership representative informed Hill of the discovery of mold and water damage on cabinets and other areas of units (under flooring and on drywall behind baseboards) in these buildings that had not yet been completed. Following the initial discovery, Plaintiff engaged an environmental consultant, Vista Environmental ("Vista") who performed multiple additional inspections and testing between October and December 2020 on all buildings that had cabinets and flooring installed, Buildings 4, 6, 7, 8, and 10. On information and belief, Hill engaged separate consultants that performed investigations in October 2020 of some or all of these buildings.

27.    During Vista's inspection, visual testing, and destructive testing in October and November 2020, Vista identified significant mold growth on the undersides of kitchen and bathroom cabinetry in 2nd, 3rd, and 4th floor units, lower sections of floor mounted cabinets with elevated moisture content (water damage) in these units, and gypcrete (a lightweight concrete like material below the cabinets and plank flooring) with elevated moisture contents. Based on Vista's

initial findings, Vista performed evaluations of additional units in Buildings 4, 6, 7, 8, and 10.

28.     Vista's inspection and testing determined that remediation and reconstruction were required in all units on the 2nd, 3rd or 4th floors of buildings 4, 6, 7, 8, and 10. The units were found to have mold growth on bathroom and/or kitchen cabinets installed on the gypcrete and the vast majority also showed signs of water damage. There were no signs of water damage or mold growth observed on any of the cabinetry installed on the walls (not in contact with the gypcrete) in any units on the 1st, 2nd, 3rd or 4th floors. Additionally, no mold growth or water damages was observed in lower kitchen and bathroom cabinets in 1st floor units that did not have gypcrete subflooring.

29.     In consultation with Vista, Plaintiff developed a detailed remediation plan to address the mold and water damage in Buildings 4, 6, 7, 8, and 10 and determined the estimated cost of this work. Plaintiff provided information about the remediation plan and estimated remediation and reconstruction to the Underwriters. To implement the remediation and reconstruction plan, Plaintiff engaged Restoration Management Company ("RMC") to contain the affected units, remove finishes (lower cabinets, countertops, plumbing fixtures, vinyl flooring and drywall), perform remediation, and conduct reconstruction (reinstallation of lower cabinets, countertops, plumbing fixtures, vinyl flooring, drywall and paint) when remediation and drying were shown to be properly completed. Vista also performed visual and moisture assessments until environmental samples and moisture testing indicated the remediation was successfully completed.

30.     The primary remediation and reconstruction efforts began in

December 2020 and continued until July 2021, with some spot remediation and reconstruction efforts continuing until November 2021 in certain buildings. Plaintiff, as representative for all contractors, etc., incurred substantial sums in the investigation, testing, remediation, restoration, reconstruction, repairs, replacement of property, etc. Plaintiff acted promptly, comprehensively and effectively to address the mold related issues. Despite diligence of Plaintiff, the completion and opening of the Project was delayed, thereby causing Plaintiff to sustain further losses including loss of loss of rental income, additional interest expense on construction loans, legal fees, additional insurance costs, real estate taxes, and project administration and development costs, and additional cost for delayed opening.

### THE BUILDERS RISK POLICY

31.    Plaintiff, acting through licensed insurance agents and brokers, procured a first-party insurance product—commonly referred to as builders risk insurance—to protect itself and others against constructions risks during the course of construction at the Project. Because of the scope of the Project and breadth of attendant construction risks, multiple insurance companies and other underwriters participated at various percentages of the total insured risk. The respective participants each issued a separate contract of insurance bearing a unique policy number and a schedule of the corresponding risk participation. The builders risk insurance procured by Plaintiff, referred to herein as "Policy," consists of the following constituent contracts of insurance:

A.    WESTCHESTER    SURPLUS    LINES    INSURANCE COMPANY issued an insurance policy, No. I11147513 001, for the policy period 09/05/2018 to 10/30/2021, to named

insured, THE HAVEN AT VENTURA, LLC.

B. GENERAL SECURITY INDEMNITY COMPANY OF ARIZONA issued an insurance policy, No. FA0045121-2018-1, for the policy period 09/05/2018 to 10/30/2021, to named insured, THE HAVEN AT VENTURA, LLC.

C. ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY issued an insurance policy, No. IMU100137145-00, for the policy period 09/05/2018 to 10/30/2021, to named insured, THE HAVEN AT VENTURA, LLC.

D. CERTAIN UNDERWRITERS AT LLOYD'S issued insurance policies, Nos. COC-18121, CSN0003960 and BR93911800015, for the policy period 09/05/2018 to 07/06/2020, to named insured, THE HAVEN AT VENTURA, LLC.

E. CERTAIN UNDERWRITERS AT LLOYD'S issued an insurance policy, No. CSN0009504, for the policy period 07/06/2020 to 10/30/2021, to named insured, THE HAVEN AT VENTURA, LLC.

32. The aforementioned insurance companies and underwriters are herein collectively referred to as the "Underwriters." Acting through authorized representatives, they each delivered the Policy to Plaintiff in the State of California. The shared risk of each Underwriter is scheduled on a Participation Page. Attached hereto as <u>Exhibit A</u> is true and correct compilation of the

respective Participation Pages of the Underwriters. The aforementioned constituent contracts of insurance (i.e., insurance policies) each schedule and affix a common coverage form—designated as Form No. MS-63974 (09/18)—entitled CONSTRUCTION RISK COVERAGE FORM, hereinafter "Coverage Form." Attached hereto as <u>Exhibit B</u> is a true, correct, and complete copy of the Coverage Form.

33.    In Part A of the Coverage Form, entitled "Insuring Agreement," the Underwriters broadly promised the Policy "insures against direct physical LOSS to property of every kind and description intended to become a permanent part of, or be consumed in, the construction, fabrication, assembly, installation, erection or alteration of the INSURED PROJECT…" The term, INSURED PROJECT, is scheduled to mean the Project, as defined above. In Part B, entitled "Extensions of Coverage," the Underwriters promised to provide additional "extensions of coverage" including "Limited Coverage for FUNGUS, Wet Rot, Dry Rot or Bacteria." In Endorsement Number 1, entitled "Delay In Opening Endorsement," the Underwriters promised to extend certain insurance coverage including loss of rental income, soft costs, additional expenses, etc.

34.    Section II of the Declarations schedules the dollar amount of $**69,564,036** adjacent to "Limits of Insurance," and states immediately below, "The Company will pay no more for direct physical LOSS in any one OCCURRENCE than the above Limit of Insurance." The term OCCURRENCE is defined as, "All LOSS attributable directly or indirectly to one originating cause, event, incident or repeated exposure to the same originating cause, event or incident, or to one series of similar originating causes, events, incidents or repeated exposures …"

35.     Section II. also schedules (a) the dollar amount of **$1,000,000** as the annual aggregate sublimit for "Limited Coverage for FUNGUS, Wet Rot, Dry Rot or Bacteria[;]" (b) the dollar amount of **$57,109,085** for "Physical Loss to the INSURED PROJECT[;]" and (c) the dollar amount of **$12,454.951** as the sublimit for Delay In Opening.

36.     Part E of the Coverage Form, "Policy Conditions," is subject to an endorsement (Endorsement No. 8) that amends and overrides conflicting language in the provisions relating to other insurance:

> The Policy at PART E—POLICY CONDITIONS, Clause 13. Other Insurance, Clause 14. Contributing Insurance and Clause 15. Excess Insurance are amended to include the following:
>
> > Notwithstanding anything to the contrary herein, it is agreed that this Policy provides primary insurance for the NAMED INSURED, but only in relation to the INSURED PROJECT as described upon the Declarations. In the event of LOSS which is insured by this Policy be also insured under any other policy(ies) of insurance in effect for the benefit of the NAMED INSURED or any Additional Insureds, and which is of the same type and covering the INSURED PROJECT, this Company will indemnify the NAMED INSURED as if such other policy(ies) of insurance did not exist and the Company shall waive rights of

recovery, if any, against the insurer(s) of such other policy(ies) of insurance. It is the intent of this Policy to only be primary as respects the INSURED PROJECT described upon the Declarations.

* * * * *

37.     Section VI. of the Declarations, entitled "Additional NAMED INSURED Information," extends named insured status to "All owners, all contractors and subcontractors of every tier, and tenants at the project location, as required by any contract, subcontract for the INSURED PROJECT…" Section VI. further provides:

The Haven at Ventura, LLC shall be deemed the sole and irrevocable agent of each and every Insured hereunder for the purpose of giving and receiving notices to/from the Company, giving instruction to or agreeing with the Company as respects Policy alteration, for making or receiving payments of premium or adjustments to premium, and as respects the payment for claims.

* * * * *

## THE CLAIM DENIALS

38.     Pursuant to the terms of the Coverage Form, including the conditions relating to notice and cooperation, Plaintiff promptly tendered the Claim during October 2020. The Underwriters engaged separate consultants who performed investigations of some or all of the subject buildings at the Project. Plaintiff and others provided the Underwriters with all relevant documentation—including

without limitation inspection reports, expert and consultant reports, cost estimates, status reports, diagnostic and testing reports, repair and reconstruction expenses, etc.

39.    On January 6, 2021, the Underwriters formally acknowledged receipt of the Claim in writing and purported to reserve rights on certain language in the Coverage Form. On January 12, 2021, the Underwriters disclaimed coverage for the Claim stating in part as follows:

> The Insurers advise that the facts as presented show that the mold simply developed and, as quoted above, mold is an excluded cause of loss. It is only covered to the extent it directly resulted from an occurrence that is covered by the Policies. Here, the mold resulted from either excluded faulty workmanship or excluded dampness of atmosphere, or a combination of both. Thus, the Insurers advise that no coverage is owed based on the facts as presented and the Coverage Form provisions quoted above.

*  *  *  *  *

40.    On February 19, 2021, Plaintiff transmitted correspondence to the Underwriters, rebutting the bases for the denial of coverage. On June 8, 2021, Underwriters responded to Plaintiff and reaffirmed the January 12, 2021 denial of coverage. Plaintiff thereafter engaged insurance counsel to perform a coverage analysis of the coverage positions of the Underwriters. On November 15, 2021, Plaintiff's counsel provided the Underwriters' counsel with a legal analysis of the coverage issues. Based on the policy language affording coverage, Plaintiff's

counsel demanded payment for losses resulting from water; for losses resulting from mold; and for all losses within the Delay In Opening Endorsement including loss of rental income. On December 20, 2021, the Underwriters reaffirmed their denial of coverage.

41.    On information and belief, the Underwriters each contend that the Policy provides no coverage on the following grounds: (a) the Policy's exclusionary clause for FUNGUS, Wet Rot, Dry Rot or Bacteria precludes coverage for the entirety of the Claim; (b) the Policy's exclusion for "dampness of atmosphere" precludes coverage for the entirety of the Claim; (c) the Cost of Making Good provisions preclude coverage for the entirety of the Claim; (d) the Policy's coverage extension for FUNGUS, Wet Rot, Dry Rot or Bacteria does not apply to the Claim or any portion thereof; and (e) the Policy's other coverages do not apply to the Claim including coverages afforded under the Delay In Opening Endorsement. Plaintiff disputes each contention of the Underwriters.

## FIRST CLAIM FOR RELIEF
### (Declaratory Relief Against All Defendants)

42.    Plaintiff incorporates by reference each of the allegations set forth above as if set forth herein.

43.    There presently exists an actual justiciable controversy between Plaintiff and the Underwriters, and each of them, concerning the obligations of the Underwriters under the Policy for the Claim. Said controversy is ripe for judicial review and Plaintiff therefore seeks a declaration as to its entitlement to payment for the insurance benefits described below.

44.    The Claim, including all of Plaintiff's losses, fall within the scope of

the Insuring Agreement, because each and every item of loss constitutes covered property at the Project that sustained direct physical loss or damage within the effective dates of coverage. On information and belief, the Underwriters do not contend that the Claim falls outside the scope of the Insuring Agreement; rather, they contend that the following exclusionary clause set forth in the Coverage Form, hereinafter "Fungus Exclusion," precludes coverage for the entirety of the Claim:

**Excluded Causes of LOSS**

**This Policy does not insure LOSS caused directly or indirectly by any of the following, and such LOSS is excluded concurrently, or in sequence to the LOSS**:

• • •

14.   Any LOSS or expense consisting of, caused by, contributed to, or aggravated by FUNGUS, wet rot, dry rot or bacteria, whether directly or indirectly the result of an insured peril.  This includes, but is not limited to, the cost for investigation, testing, remediation services, extra expense or business interruption. Such LOSS is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the LOSS.

* * * * *

45.   The Policy affords coverage for damage caused by water. Section IV. of the Declarations schedules a deductible in the dollar amount of **$50,000** for "LOSS in any one OCCURRENCE caused by or resulting from WATER

DAMAGE[,]" which is defined broadly to mean, "All water damage, except LOSS caused by or resulting from the peril of FLOOD." Coverage for WATER DAMAGE to covered property falls within the sublimit of insurance for "Physical LOSS to the INSURED PROJECT."

46.     The provisions of the Fungus Exclusion reflect an underwriting awareness of, and intent to provide coverage for, mixed claims in which some items of covered property sustain injury from an excluded cause and other items of covered property sustain injury from an unexcluded cause. For example, the second paragraph of the Fungus Exclusion provides in part:

> If LOSS otherwise covered by this Policy occurs, and the cost of removal of debris is increased due to the presence of FUNGUS, wet rot, dry rot or bacteria, this Policy will only be liable for the costs of debris removal which would have been incurred had no such factors been present in, on, or about the insured property to be removed.

*  *  *  *  *

47.     An actual controversy has arisen and now exists between Plaintiff and the Underwriters concerning their respective rights and duties. Plaintiff contends that, even if the Fungus Exclusion precludes coverage for certain items of loss, other items of loss sustained damage solely from causes other than mold, such as elevated levels of moisture, i.e., WATER DAMAGE, thereby falling outside the exclusionary scope of the Fungus Exclusion and within the sublimit of insurance for Physical LOSS to the INSURED PROJECT. On information and

belief, the Underwriters disagree and contend that, because mold damage was the primary purpose of Plaintiff's investigation, remediation and repairs, etc., the Fungus Exclusion applies broadly to all related expenses.

48.     A declaration of the parties' rights and obligations is necessary and required in order to resolve the foregoing disputes. A declaratory judgment is both necessary and proper under the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., to determine the rights, obligations and liabilities that exist among and between the parties. Plaintiff desires a judicial determination and declaration of the respective rights, duties and obligations of the parties under the Policy, and specifically that the Fungus Exclusion does not preclude coverage for items of loss that sustained damage from causes other than mold.

49.     Wherefore, Plaintiff prays for judgment against Defendants, and each of them, as more fully set forth below.

## SECOND CLAIM FOR RELIEF
### (Declaratory Relief Against All Defendants)

50.     Plaintiff incorporates by reference each of the allegations set forth above as if set forth herein.

51.     There presently exists an actual justiciable controversy between Plaintiff and the Underwriters, and each of them, concerning the obligations of the Underwriters under the Policy for the Claim. Said controversy is ripe for judicial review and Plaintiff therefore seeks a declaration as to its entitlement to payment for the insurance benefits described below.

52.     The Policy affords a coverage extension entitled, "Limited Coverage

for FUNGUS, Wet Rot, Dry Rot or Bacteria," hereinafter "Mold Coverage Extension," with limits of **$1,000,000**. The insuring provisions of the Mold Coverage Extension state:

    B.    Under this Extension of Coverage, the Company will pay for:

        1.    Direct physical LOSS to insured property at the INSURED PROJECT caused by FUNGUS, wet rot, dry rot or bacteria, including the cost of removal of the FUNGUS, wet rot, dry rot or bacteria;

        2.    The cost to tear out and replace any part of a building or other insured property as needed to gain access to FUNGUS, wet rot, dry rot or bacteria covered by this Endorsement; and

        3.    The cost of testing performed after removal, repair, replacement or restoration of the damaged insured property is completed, provided there is a reason to believe that FUNGUS, wet rot, dry rot or bacteria are present.

*  *  *  *  *

53.    The Policy defines FUNGUS to mean, "Any type or form of FUNGUS, including mold or mildew, and any mycotoxins, spores, scents or byproducts produced or released by fungi."

54.     Plaintiff contends that, if and to the extent that the Fungus Exclusion precludes coverage for particular losses and loss items in the Claim, the Mold Coverage Extension attaches to any and all such losses, and that such losses exceed the annual aggregate sublimit of **$1,000,000** under the Mold Coverage Extension.

55.     On information and belief, the Underwriters disagree with Plaintiff and contend that the Mold Coverage Extension, which is located in Part C, Extensions of Coverage, functions as an exception to the Fungus Exclusion, which is located in Part D, Exclusions, and therefore Plaintiff bears the burden of proving the Claim falls within Mold Coverage Extension. On information and belief, the Underwriters further contend that the Mold Coverage Extension is subject to a "covered occurrence" requirement, such that Plaintiff bears the burden to prove a cause in fact of loss that is not within an exclusionary clause. In support of their contentions, the Underwriters cite to the definition of OCCURRENCE:

18.     OCCURRENCE

All LOSS attributable directly or indirectly to one originating cause, event, incident or repeated exposure to the same originating cause, event or incident, or to one series of similar originating causes, events, incidents or repeated exposures to the same originating cause, event or incident first occurring in the Policy period.

\* \* \* \* \*

56.     The Underwriters further contend that the mold damage resulted from only one of two potential causes of loss, i.e., "dampness of atmosphere" and

"faulty workmanship;" that one is necessarily the efficient proximate cause of all losses in the Claim; that those two causes are plainly, conspicuously and clearly excluded under the Policy; and therefore, Plaintiff cannot satisfy its burden of proving that an exception to the Fungus Exclusion applies under the circumstances of the Claim. In support of said contentions, the Underwriters rely upon the excluded cause, "Dryness and dampness of atmosphere[,]" and the following provisions in Part D of the Coverage Form:

> 17.   Cost of Making Good:
>
> The costs that would have been incurred to rectify any of the following had such rectification been effected immediately prior to the LOSS:
>
> A.   Fault, defect, error, deficiency or omission in design, plans, specifications, engineering or surveying;
>
> B.   Faulty or defective workmanship, supplies or material;
>
> However, if direct physical LOSS by an insured peril ensues, then this Policy will provide cover for such ensuing LOSS only.
>
> *  *  *  *  *

57.   An actual controversy has arisen and now exists between Plaintiff and the Underwriters concerning their respective rights and duties. Plaintiff contends the Mold Coverage Extension attaches to the Claim, because the evidence submitted to the Underwriters demonstrates losses exceeding

$1,000,000 as a result of mold. Plaintiff further contends the evidence does not demonstrate "dampness of atmosphere" is the efficient proximate cause of the Claim. Plaintiff further contends the purported exclusionary scope of the Cost of Making Good (COMG) provisions is limited to a small fraction of the Claim, i.e., costs that would have been incurred to rectify defects, faulty workmanship, etc. had such rectification been effected immediately prior to the LOSS.

58.     On information and belief, the Underwriters disagree with Plaintiff and contend, in effect, that Plaintiff bears the burden of disproving excluded causes; that conflicting opinion evidence exists regarding "dampness of atmosphere" as the efficient proximate cause of loss; that the plain meaning of the COMG provisions is that faulty workmanship by any named insured contractor constitutes an excluded cause where such faulty workmanship causes damage to the work of other named insured contractors; that the Mold Coverage Extension and incorporated definition of OCCURRENCE impose an enforceable contractual obligation upon Plaintiff to prove a "covered occurrence," i.e., a cause in fact that is outside the scope of all other exclusionary clauses.

59.     A declaration of the parties' rights and obligations is necessary and required in order to resolve the foregoing disputes. A declaratory judgment is both necessary and proper under the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., to determine the rights, obligations and liabilities that exist among and between the parties. Plaintiff desires a judicial determination and declaration of the respective rights, duties and obligations of the parties under the Policy, and specifically that the Mold Coverage Extension applies to the Claim.

60.     Wherefore, Plaintiff prays for judgment against Defendants, and each of them, as more fully set forth below.

## THIRD CLAIM FOR RELIEF

### (Declaratory Relief Against All Defendants)

61.     Plaintiff incorporates by reference each of the allegations set forth above as if set forth herein.

62.     There presently exists an actual justiciable controversy between Plaintiff and the Underwriters, and each of them, concerning the obligations of the Underwriters under the Policy for the Claim. Said controversy is ripe for judicial review and Plaintiff therefore seeks a declaration as to its entitlement to payment for the insurance benefits described below.

63.     The Policy affords additional coverage under the Delay In Opening Endorsement, which provides in part as follows:

> Subject to all terms, conditions, limitations and exclusions of this Endorsement, and of the Policy to which it is attached, the Company will pay the actual Loss of RENTAL INCOME, Loss of BUSINESS INCOME and/or SOFT COSTS/ADDITIONAL EXPENSES sustained during the PERIOD OF INDEMNITY as a result of a DELAY in completion of the INSURED PROJECT described on the Policy Declarations, or as amended by Endorsement, when such DELAY is caused by an OCCURRENCE or series of OCCURRENCE(S), resulting in physical LOSS to insured property by an insured peril.

* * * * *

64.     The Delay In Opening Endorsement schedules the dollar amount of

**$5,177,009** for loss of RENTAL INCOME, which is defined to mean, "Revenues from rentals and leases not realized during the PERIOD OF INDEMNITY, which would have been earned by the NAMED INSURED if the DELAY had not occurred, less non-continuing expenses." The term DELAY is defined to mean, "The period of time between the SCHEDULED DATE OF COMPLETION and the actual date on which commercial operations or use and occupancy can commence with the exercise of due diligence and dispatch." The term LOSS is defined to mean, "Accidental loss or damage."

65.     The Delay in Opening Endorsement also schedules the dollar amount of **$7,277.942** for "SOFT COSTS / ADDITIONAL EXPENSES," which are defined to mean, "Expenditures which are necessarily incurred during the PERIOD OF INDEMNITY, which would not have been incurred by the NAMED INSURED if the DELAY had not occurred…"

66.     As alleged more fully above, Plaintiff contends that an insured peril within the Physical LOSS to INSURED PROJECT sublimit of insurance ($57,109,085) and a separate insured peril within the Mold Coverage Extension ($1,000,000) caused a physical LOSS to covered property. Plaintiff further contends that as result of such insured physical LOSS, Plaintiff sustained an actual delay in opening within the meaning of the endorsement's definition of DELAY, which exceeded the 14-day WAITING PERIOD. As a result of the DELAY, Plaintiff sustained resulting losses within the meaning of the endorsement's definition of RENTAL INCOME, SOFT COSTS, and ADDITIONAL EXPENSES in amounts to be proven at trial. Plaintiff satisfied all applicable conditions in the Coverage Form and the Delay In Opening Endorsement.

67.     An actual controversy has arisen and now exists between Plaintiff

and the Underwriters concerning their respective rights and duties. Plaintiff contends that the Claim falls with the insuring provisions of the Delay In Opening Endorsement, whereas on information and belief, the Underwriters contend that, because the Policy excludes coverage under the Fungus Exclusion, etc., Plaintiff has not shown or sustained a predicate "insured peril," and therefore the coverage afforded under the Delay In Opening Endorsement was not triggered and does not apply.

68.     A declaration of the parties' rights and obligations is necessary and required in order to resolve the foregoing disputes. A declaratory judgment is both necessary and proper under the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., to determine the rights, obligations and liabilities that exist among and between the parties. Plaintiff desires a judicial determination and declaration of the respective rights, duties and obligations of the parties under the Policy, and specifically that the Claim, including Plaintiff's loss of rental income, are within the Delay In Opening Endorsement.

69.     Wherefore, Plaintiff prays for judgment against Defendants, and each of them, as more fully set forth below.

## FOURTH CLAIM FOR RELIEF
### (Breach of Contract Against All Defendants)

70.     Plaintiff incorporates by reference each of the allegations set forth above as if set forth herein.

71.     The Policy, and each constituent contract of insurance, is an enforceable contract between Plaintiff—in its individual capacity, and as designee of each named insured—and the Underwriters, and each of them.

72.     The Claim presents covered losses under the terms of the Policy.

73.     Plaintiff has at all relevant times herein performed the terms and conditions of the Policy in the manner specified therein except to the extent its performance is excused by the Underwriters' breach, default, or failure to perform under the terms and conditions of the Policy.

74.     As alleged herein, the Underwriters promised Plaintiff, including each of the named insureds for whom Plaintiff represents, to indemnify for direct physical loss or damage to covered property within the effective dates of coverage and not otherwise excluded.

75.     Plaintiff sustained losses, including the Claim, and reported same to Underwriters on a timely basis and satisfied all post-loss conditions in the Policy.

76.     The Underwriters have breached the Policy in that they adopted erroneous positions regarding the availability of insurance coverage for the Claim, as alleged herein, and based thereon refused to fully investigate and indemnify Plaintiff.

77.     As a direct and proximate result of the breaching conduct of the Underwriters, and each of them, Plaintiff has sustained actual damages to be proven at trial.

78.     Wherefore, Plaintiff prays for judgment against Defendants, and each of them, as more fully set forth below.

/ / /

/ / /

/ / /

# FIFTH CLAIM FOR RELIEF

## (Breach of Contract Against All Defendants)

79.    Plaintiff incorporates by reference each of the allegations set forth above as if set forth herein.

80.    The Policy, and each constituent contract of insurance, is an enforceable contract between Plaintiff—in its individual capacity, and as designee of each named insured—and the Underwriters, and each of them.

81.    The Claim presents covered losses under the terms of the Policy.

82.    Plaintiff has at all relevant times herein performed the terms and conditions of the Policy in the manner specified therein except to the extent its performance is excused by the Underwriters' breach, default, or failure to perform under the terms and conditions of the Policy.

83.    As alleged herein, the Underwriters promised indemnify Plaintiff under the Delay In Opening Endorsement for certain losses including loss of rental income, hereinafter "Delay Coverage."

84.    Plaintiff sustained a losses, including the Claim, falling within the scope of the Delay Coverage and reported same to Underwriters on a timely basis and satisfied all post-loss conditions in the Policy.

85.    The Underwriters have breached the Policy in that they adopted erroneous positions regarding the availability of Delay Coverage for the Claim, as alleged herein, and based thereon refused to fully investigate and indemnify Plaintiff.

86.    As a direct and proximate result of the breaching conduct of the

Underwriters, and each of them, Plaintiff has sustained actual damages to be proven at trial.

87.     Wherefore, Plaintiff prays for judgment against Defendants, and each of them, as more fully set forth below.

## SIXTH CLAIM FOR RELIEF
### (Breach of Implied Covenant of Good Faith and Fair Dealing
### Against All Defendants)

88.     Plaintiff incorporates by reference each of the allegations set forth above as if set forth herein.

89.     Implied in the Policy is the obligation to act fairly and in good faith with Plaintiff and to promptly investigate any claims and avoid unfairly denying Plaintiff the benefits to which it is entitled under the Policy. The Underwriters at all times relevant herein owed a duty to act fairly and in good faith with Plaintiff in meeting their responsibilities under the Policy, including giving Plaintiff's interests at least as much weight as theirs.

90.     On information and belief, the Underwriters knew or should have known that, when their third-party administrator and counsel issued the various disclaimer letters in February, June and December of 2021, the following legal rules and principles of California law governed their conduct, their interpretation of the Policy, and their formal response to the Claim:

> A. Insurance policy language that grants, describes, extends or expands coverage must be interpreted broadly in favor of coverage, whereas policy language

that is restrictive or exclusionary in nature, or which otherwise limits coverage, must be construed narrowly.

B. Insurance carriers are prohibited from placing their interests ahead of the insureds interests.

C. Insurance companies cannot deny coverage on the basis of exclusions unless they possess evidence conclusively demonstrating the exclusion's application under the circumstances of the claim.

D. In responding to a claim for insurance benefits, insurance carriers possess a nondelegable duty to perform a reasonable investigation including diligent efforts to find sources of coverage under the subject insurance policy.

E. Insurance carriers must respond to claims within specific time parameters under state regulations governing claims handling, and that disclaimer letters must by law include all facts and policy language relevant to the denial of coverage.

91. The Underwriters' improper and intentionally deceptive underwriting and claims handling practices have deprived Plaintiff of the full benefit of the insurance coverage to which it is entitled under the Policy. The conduct of the Underwriters, and each of them, is part of a larger pattern and practice of improper and intentionally deceptive underwriting and claims handling intended to deprive

their insureds of the benefits of insurance. The Underwriters breached their obligation to act fairly and in good faith toward Plaintiff by:

A. Misinterpreting policy form language consciously and deliberately;

B. Failing to pay the Claim in a reasonable and proper manner and unreasonably withholding of payment benefits to Plaintiff;

C. Not investigating Plaintiff's claim in a reasonable and proper manner;

D. Inventing spurious grounds for avoidance of coverage without regard to the pertinent policy language, facts, or law;

E. Failing to adequately advise Plaintiff of its rights under the terms of the Policy;

F. Failing to provide a prompt and reasonable explanation of the bases relied on, in relation to the facts or applicable law, for the denial of coverage;

G. Relying on a legal standard concerning an insurance carrier's duty to investigate and pay not recognized under California law;

H. Compelling Plaintiff to adhere to policy form language dictated by the Underwriters and then

refusing to adhere to the same policy language;

I.  Frustrating the agreed upon purpose between Plaintiff and Underwriters of the Policy consciously and deliberately;

J.  Characterizing a coverage extension as an exception to an exclusion in another section of the insurance policy, and importing a "covered occurrence" requirement from an ambiguous definition, in order to shift the burden to Plaintiff to disprove the application of exclusions; and

K.  Other wrongful and illegal conduct according to proof at trial.

92.    On information and belief, the Underwriters' acts and omissions, as alleged herein, were, both collectively and in each individual instance, unreasonable and tortious denials of the existence of, and tortious refusals to perform, their known contractual obligations.

93.    On information and belief, the Underwriters, and each of them, possessed both actual and constructive knowledge of the wrongfulness of their acts and omissions, as alleged herein, contemporaneous with each such act and omission.

94.    On information and belief, the Underwriters acts and omissions, as alleged herein, constitute a consciously undertaken pattern of conduct by the Underwriters that is intentionally contrived to wrongfully deny insureds the

benefits of their insurance coverage and to mislead those insureds into believing that the wrongful denial is justified.

95.     On information and belief, the Underwriters' course of action is financially motivated so as to directly benefit the Underwriters to the corresponding detriment of Plaintiff whose benefit the Underwriters are wrongfully denying.

96.     As a direct and proximate result of Underwriters' breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered damages including but not limited to expenses relating to its investigation, restoration, remediation, repair, reconstruction, replacements, loss of rental income, additional interest expense on construction loans, legal fees, additional insurance costs, real estate taxes, project administration and development costs, and all other direct, indirect, consequential, incidental, special, compensatory, and other species of damages resulting from Underwriters' conduct alleged herein, including without limitation its attorneys' fees and litigation expenses, all of which are authorized under California law including <u>Brandt v. Sup.Ct. (Standard Ins. Co.)</u> (1985) 37 Cal.3d 813.

97.     On information and belief, Plaintiff asserts that in committing the aforementioned acts, the Underwriters acted with oppression, fraud, and malice with the intent to willfully injure, harass, vex, and annoy Plaintiff with a conscious disregard for Plaintiff's rights. All of the aforementioned alleged acts were done or ratified by Underwriters' management level employees, who acted with knowledge that Underwriters' conduct would cause Plaintiff harm. Plaintiff is therefore entitled to recover punitive damages pursuant to Civil Code § 3294.

98.     Wherefore, Plaintiff pray for judicial relief and judgment as set forth more particularly below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demand judgment against Defendants, and Does 1 through 10, inclusive, as follows:

**On the First Cause of Action:**

1. For a declaration that certain damages sustained Plaintiff—including without limitation the investigation, restoration, and repair expenses—fall outside the scope of the Fungus Exclusion, even if other items of loss fall within said exclusion; and that such damages are within and subject to the sublimit of insurance for Physical LOSS to the INSURED PROJECT.

2. For an order pursuant to said declaration that Underwriters must pay Plaintiff under the Policy for those portions of the Claim that resulted from causes that are not excluded causes.

**On the Second Cause of Action:**

3. For a declaration that the Claim—including without limitation the investigation, restoration, and repair expenses—fall within the Mold Coverage Extension.

4. For an order pursuant to said declaration that Underwriters must pay Plaintiff under the Policy and up to the $1,000,000 annual aggregate sublimit for all portions of the Claim within the Mold Coverage Extension.

**On the Third Cause of Action:**

5.  For a declaration that the Claim—including without limitation the loss of rental income, soft costs, and additional expenses—falls within the insurance coverage afforded under the Delay In Opening Endorsement.

6.  For an order pursuant to said declaration that Underwriters must pay Plaintiff under the Delay In Opening Endorsement for its insured losses in an amount to be proven at trial.

**On the Fourth Cause of Action:**

7.  A money judgment in favor of Plaintiff and against the Underwriters for any and all contract damages, whether denominated as economic, consequential, incidental, etc. including without limitation the full amount of all investigation, restoration and repair expenses, plus pre-judgment interest and any additional, related, or incidental coverage benefits.

**On the Fifth Cause of Action:**

8.  A money judgment in favor of Plaintiff and against the Underwriters for any and all contract damages, whether denominated as economic, consequential, incidental, etc. including without limitation the full amount of all loss of rental income, soft costs, additional expenses, etc., plus pre-judgment interest and any additional, related, or incidental coverage benefits.

**On the Sixth Cause of Action:**

9.  A money judgment in favor of Plaintiff and against the Underwriters for any and all tort damages, however denominated, including economic losses resulting from the conduct of the Defendants, and each of them.

10. For attorney fees and litigation expenses.

11. For punitive and exemplary damages.

**On All Claims for Relief:**

12. For all damages to be proven at trial.

13. For pre-judgment interest and post-judgment interest on all sums to be paid to Plaintiff calculated at the highest legal rate from the earliest possible date.

14. For costs of suit.

15. And for such other and further relief as the Court deems just and equitable under the circumstances.


Dated: February 23, 2022               By: _____

                                            Jeffrey S. Bolender, Esq.
                                       Attorneys for Plaintiff

**DEMAND FOR JURY TRIAL**

Plaintiff hereby respectfully demand a jury trial on any issues that may be triable to a jury.

Dated: February 23, 2022            By:

_____
Jeffrey S. Bolender, Esq.
Attorneys for Plaintiff