1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                      CENTRAL DISTRICT OF CALIFORNIA

10

11    THE HAVEN AT VENTURA, LLC,              Case No.:  2:22-cv-01284-MEMF-MAA

12                          Plaintiff,        **ORDER DENYING MOTION FOR**
                                              **SUMMARY JUDGMENT [ECF NO. 67]**
13              v.

14

15    GENERAL SECURITY INDEMNITY
      COMPANY OF ARIZONA; WESTCHESTER
16    SURPLUS LINES INSURANCE COMPANY;
      ENDURANCE AMERICAN SPECIALTY
17    INSURANCE COMPANY; CERTAIN
      UNDERWRITERS AT LLOYD'S, LONDON
18    KNOWN AS SYNDICATES TMK 510 and
      TMK 1880 and DOES 1-20, inclusive,
19
                            Defendants.
20

21

22

23            Before the Court is a Motion for Summary Judgement filed by Defendants General Security

24    Indemnity Company of Arizona, Westchester Surplus Lines Insurance Company, Endurance

25    American Specialty Insurance Company, Certain Underwriters at Lloyd's London Known as

26    Syndicates TMK 510 and TMK 1880. ECF No. 67. For the reasons stated herein, the Court DENIES

27    the Motion for Summary Judgment.

28    / / /

O

1

I.    **Background**

a.  **Factual Background**

Plaintiff the Haven at Ventura, LLC ("Haven") constructed an apartment complex. Haven purchased insurance related to the construction from Defendants General Security Indemnity Company of Arizona ("GSICA"), Westchester Surplus Lines Insurance Company ("Westchester"), Endurance American Specialty Insurance Company ("EASIC"), Certain Underwriters at Lloyd's London Known as Syndicates TMK 510 and TMK 1880 ("Lloyd's," or collectively with GSICA, Westchester, EASIC, and Lloyd's, "Insurers"). The relevant policies had certain exclusions, including a Fungus Exclusion and a Cost of Making Good Exclusion, and had a limited Fungus Extension.

After cabinets and other materials were installed without giving concrete sufficient time and ventilation to dry, mold developed. Haven made a claim to Insurers, which Insurers denied. Haven brought suit related to the denial of that claim.

b.  **Procedural History**

Haven filed suit in this Court on February 24, 2022. ECF No. 1. Haven brings six causes of action against all Defendants: (1) a claim for declaratory relief that certain of Haven's losses fall outside the scope of the Fungus Exclusion; (2) a claim for declaratory relief that the Claim falls within the Mold Coverage Extension; (3) a claim for declaratory relief that the Claim falls within the coverage afforded for Delay in Opening; (4) a claim for breach of contract based on Defendants' failure to pay the Claim; (5) a claim for breach of contract based on Defendants' failure to cover the losses related to a delay in opening (6) a claim for breach of implied covenant of good faith and fair dealing. *See id.*

The parties stipulated to dismiss Defendants Certain Underwriters at Lloyd's, London Known as Syndicates QBE 1886, ADV 780, BAR 1955, and MSP 318, and the Court granted the stipulation and dismissed Certain Underwriters at Lloyd's, London Known as Syndicates QBE 1886, ADV 780, BAR 1955, and MSP 318 on May 24, 2022. *See* ECF Nos. 29, 30.

Insurers have retained and disclosed as purported expert witnesses two individuals—Brian Daly and Kent Sasaki—who intend to present testimony regarding the mold and its causes. *See* SUF

¶¶ 36–38. Haven has not disclosed any expert witnesses who will present testimony on the cause of the mold. *See id.* ¶¶ 39–42. Daly's report indicates that he will testify that he found only mold and no water damage, and did not find mold in places in direct contact with the Gypcrete. *See id.* ¶¶ 46, 47, 50.

Insurers filed a Motion for Summary Judgment on December 7, 2023. ECF No. 67 ("Motion" or "Mot."). The Motion did not comply with the requirements for motions for summary judgment in Section VIII(E) of the Courts Standing Order, which states that parties must file a fully integrated joint brief including each parties' summary judgment briefing, in which each issue (or sub-issue) raised by a party is immediately followed by the opposing party's response. Accordingly, on January 11, 2024, the Court ordered the parties to refile the Motion in accordance with the Court's Standing Order. ECF No. 69.

Insurers filed an Amendment to their Motion, which was properly integrated per the Court's Standing Order, on January 23, 2024. ECF No. 71 ("Amended Motion" or "Am. Mot.").

The Court held a hearing on the Motion on May 2, 2024.

## II.    **Findings of Fact**[1]

Haven constructed a multi-building residential apartment complex (the "Project") on a property in Ventura, California (the "Property"). *See* SUF ¶ 1. Insurers issued first-party builder's risks policies (the "Policies") which insured certain constructions risks that might be experienced by Haven. *See id.* ¶ 3. Insurers each issued Policies to Haven, which identified participation percentages totaling 100%. *Id.* ¶ 4.

---

[1] The facts set forth below are taken from the parties' Statement of Uncontroverted Facts and Conclusions of Law and the evidence cited therein. *See* ECF No. 67-1 ("SUF"). To the extent that any statements of fact are omitted, the Court concludes they are not material to the disposition of this Motion. To the extent that any of the facts set below were allegedly disputed by the opposing party, the Court concludes that no actual dispute exists or that the adopted language resolves the dispute.

In making these Findings of Fact, the Court considered Haven's and Defendants' Evidentiary Objections. ECF Nos. 67-38, 67-39. The Court did not find any evidence that either party objected to essential to finding any fact stated herein, except where explicitly stated otherwise. The Court need not reach any objection except those addressed in this Order.

Haven is managed by non-party Johnson Development Associates, Inc. ("JDA"). *See id.* ¶ 10. JDA was the developer of the Project and acted on Haven's behalf. *See id.* ¶ 12. Non-party OTO Development LLC ("OTO") is a construction contracting company and has some ownership in common with JDA. *See id.* ¶ 13. Haven retained OTO as an owners' representative and project manager to assist with the Project. *See id.* ¶ 14. Haven hired non-party Hill Contractors 1 ("Hill") as a general contractor on the project.[2] *See id.* ¶ 15.

### A. The Policies

The parties agree that the Policies are "the same in all material respects" relevant to this Order, and so the Court will focus its analysis on the "Chubb Policy" issued by Defendant Westchester. *See* Am. Mot. at 7; *see also* SUF ¶¶ 3–9. The Chubb Policy is a "manuscript insurance product."[3] *See* SUF ¶ 95.

#### i. Basic Coverage

The Policies provided insurance coverage to Haven for certain losses that might occur during construction of the Project in a defined time period. *See id.* ¶ 5; *see also* ECF No. 67-4 at 16. The Chubb Policy defines a "LOSS" as "Accidental loss or damage." *See* SUF ¶ 77. The Chubb Policy defines an OCCURRENCE as:

> All LOSS attributable directly or indirectly to one originating cause, event, incident or repeated exposure to the same originating cause, event or incident, or to one series of similar originating causes, events, incidents or repeated exposures to the same originating cause, event or incident first occurring in the Policy period. All such LOSS will be treated as one OCCURRENCE , unless a specific period of time is included in this Policy. The most the Company will pay for LOSS in any one OCCURRENCE is the applicable Limit of Insurance shown on the Declarations.

> ECF No. 67-4 at 42.

---

[2] Insurers submitted as a purported fact that "In this lawsuit, distinguishing between actions taken by Haven/JDA/OTO, their general contractor, or subcontractors, is generally unnecessary, given the breadth of the definition of Named Insured in the Policies." *See* SUF ¶ 16. To the extent that this may be true, the Court finds that it would be a legal conclusion, not a fact, and so the Court will not find this as an undisputed fact.

[3] Although the parties do not define this term, the Court understands that a "manuscript insurance product" means "an insurance policy form that is custom designed for a particular insured." *See Insurance Definitions: manuscript form or policy*, INTERNATIONAL RISK MANAGEMENT INSTITUTE, https://www.irmi.com/term/insurance-definitions/manuscript-form-or-policy (last accessed April 25, 2024).

ii.   Dampness of Atmosphere Exclusion

The Chubb Policy contains an exclusion stating that the Policy "does not insure LOSS caused by . . . Dryness or dampness of atmosphere." *See id.* ¶ 78; *see also* ECF No. 67-4 at 42.

iii.   Fungus Exclusion

The Chubb Policy also contains the following exclusion related to fungus (the "Fungus Exclusion"):

> Any LOSS or expense consisting of, caused by, contributed to, or aggravated by FUNGUS, wet rot, dry rot or bacteria, whether directly or indirectly the result of an insured peril. This includes, but is not limited to, the cost for investigation, testing, remediation services, extra expense or business interruption. Such LOSS is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the LOSS.
>
> If LOSS otherwise covered by this Policy occurs, and the cost of removal of debris is increased due to the presence of FUNGUS, wet rot, dry rot or bacteria, this Policy will only be liable for the costs of debris removal which would have been incurred had no such factors been present in, on, or about the insured property to be removed.
>
> This Excluded Cause of LOSS does not apply to the extent coverage is provided in the EXTENSIONS OF COVERAGE – Limited Coverage for FUNGUS, Wet Rot, Dry Rot or Bacteria.

*See* SUF ¶ 79; *see also* ECF No. 67-4 at 30. FUNGUS is defined as "Any type or form of FUNGUS, including mold or mildew, and any mycotoxins, spores, scents or byproducts produced or released by fungi." *See* SUF ¶ 80.

iv.   Fungus Extension

The Chubb Policy also contains, as referenced above, a limited extension of coverage for fungus (the "Fungus Extension"), whereby the Chubb Policy will in some circumstances cover up to $1,000,000 of losses for "FUNGUS, Wet Rot, Dry Rot or Bacteria." *See* SUF ¶¶ 81, 82; *see also* ECF No. 67-4 at 18. The Chubb Policy states that this "limited coverage for FUNGUS, Wet Rot, Dry Rot or Bacteria" "only applies when FUNGUS, wet rot, dry rot or bacteria results directly from an OCCURRENCE that is covered by this Policy." *See* SUF ¶ 82; *see also* ECF No. 67-4 at 26. The Chubb Policy further states this under this extension of coverage, the insurer will pay for:

> 1. Direct physical LOSS to insured property at the INSURED PROJECT caused by FUNGUS, wet rot, dry rot or bacteria, including the cost of removal of the FUNGUS, wet rot, dry rot or bacteria;

2. The cost to tear out and replace any part of a building or other insured property as needed to gain access to FUNGUS, wet rot, dry rot or bacteria covered by this Endorsement; and

3. The cost of testing performed after removal, repair, replacement or restoration of the damaged insured property is completed, provided there is a reason to believe that FUNGUS, wet rot, dry rot or bacteria are present.

*See* SUF ¶ 82; *see also* ECF No. 67-4 at 26.

   v. <u>Cost of Making Good Exclusion</u>

The Chubb Policy also includes the following exclusion (the "COMG Exclusion"):

the Policy does not insure LOSS caused directly or indirectly by any of the following, and such LOSS is excluded regardless of any other cause or event that contributes concurrently, or in sequence to the LOSS:

. . .

17. Cost of Making Good:

The costs that would have been incurred to rectify any of the following had such rectification been effected immediately prior to the LOSS:

A. Fault, defect, error, deficiency or omission in design, plans, specifications, engineering or surveying;

B. Faulty or defective workmanship, supplies or material;

However, if direct physical LOSS by an insured peril ensues, then this Policy will provide cover for such ensuing LOSS only.

For the purpose of this Policy and not merely this Excluded Cause of LOSS, insured property, or any portion thereof, shall not be regarded as damaged solely by virtue of the existence of any condition stated under A. or B. above.

*See* SUF ¶ 83; *see also* ECF No. 67-4 at 27–30.

   vi. <u>Delays in Opening Provision</u>

The Chubb Policy also contained the following language regarding losses from delays in

opening:

Subject to all terms, conditions, limitations and exclusions of this Endorsement, and of the Policy to which it is attached, the Company will pay the actual Loss of RENTAL INCOME, Loss of BUSINESS INCOME and/or SOFT COSTS/ADDITIONAL EXPENSES sustained during the PERIOD OF INDEMNITY as a result of a DELAY in completion of the INSURED PROJECT described on the Policy Declarations, or as amended by Endorsement, when such DELAY is caused by an OCCURRENCE or series of OCCURRENCE(S), resulting in physical LOSS to insured property by an insured peril.

*See* SUF ¶ 88; *see also* ECF No. 67-4 at 45.

vii.    Language requiring Haven to minimize losses

Finally, the Chubb Policy also contained the following term:

> The NAMED INSURED will take reasonable steps to protect, recover or save the insured property and minimize any further or potential LOSS when the insured property has sustained direct physical LOSS by an insured peril. The acts of the NAMED INSURED or the Company in protecting, recovering or saving the insured property will not be considered a waiver or an acceptance of abandonment. The NAMED INSURED and the Company will bear the reasonable expense incurred proportionate to their respective interests under this Policy.

*See* SUF ¶ 89; *see also* ECF No. 67-4 at 38.

### B.  The Development of Mold at the Property

During the construction process, mold developed on various cabinets and building materials at the Property. *See id.* ¶ 17. Haven discovered mold on cabinets in one building by early September 2020, and by October 15, 2020, Haven documented mold in multiple locations in five other buildings. *See id.* ¶ 18. JDA sent a letter to Hill describing the mold on October 15, 2020. *See id.* ¶ 19.

Prior to the development of the mold, Gypcrete was installed at the property.[4] Gypcrete (or Gyp-Crete) is a type of concrete which contains a significant amount of water, and which has the consistency of paint, allowing it to be spread over the floor to create a level surface. *See id.* ¶ 54. Because of its water content, Gypcrete needs time and well-ventilated conditions to dry before moisture sensitive materials are installed over it. *See id.* ¶ 55. The parties agree that installing moisture sensitive materials over Gypcrete before it dries is an error. *See id.* The gypcrete used here was manufactured by non-party Maxxon. *See id.* ¶ 58. Maxxon provides a guide on the installation of Gypcrete, which recommends allowing the Gypcrete to dry in a well-ventilated space before installing other materials, and which notes that the Gypcrete itself is inorganic and so mold will not grow on Gypcrete and will instead only grow on other organic materials. *See id.* ¶¶ 58, 59.

---

[4] The SUF does not identify which entity installed the Gypcrete, or when it was installed, but the Court understands that there is no dispute that the Gypcrete was installed before the mold developed.

The Property was not dehumidified in between the installation of Gypcrete and the installation of other building materials. *See id.* ¶ 61. Instead of dehumidifying, Haven's contractors continued with other work including installation of cabinets and other materials, which then developed mold. *See id.* ¶ 63. No evidence suggests that mold would have developed if not for the installation of the cabinets and other materials before the Gypcrete had time to dry and the area was dehumidified. *See id.* ¶ 64. Mold generally does not grow instantaneously upon the installation of organic materials on top of Gypcrete. *See id.* ¶ 65.

### C. Investigation, Remediation, and Claims

After the mold developed, Haven hired non-party Restoration Hardware Company ("RHC") to remove the cabinets and other building materials that were installed without properly dehumidifying first. *See id.* ¶ 68. In the buildings affected by mold, "essentially all" of the lower kitchen and bathroom cabinets were removed due to mold. *See id.* ¶ 69; *see also* ECF No. 67-18 at 34. RHC's invoices describe all RHC's work as mold remediation and reconstruction. *See id.* ¶ 70. RMC did not specifically invoice any costs related to water damage.[5] *See id.* ¶ 71.

Haven made two insurance claims—one to Insurers, and one to non-party Navigators Specialty Insurance Company ("Navigators"). *See id.* ¶¶ 21–27. The claim to Navigators was based on a policy distinct from Insurers' Policies at issue here. *See id.* ¶¶ 22–24. Navigators paid $1 million to Haven, the policy limit amount, in response to Haven's claim. *See id.* ¶ 26. Haven submitted the claim at issue to Insurers on approximately October 19, 2020. *See id.* ¶ 27. The claim stated that "Mold has been discovered in multiple locations throughout [four buildings]." *See id.* ¶ 28.

Haven and Insurers each investigated the mold. *See id.* ¶¶ 31, 32. Insurers hired Tracy Aylor ("Aylor"), an employee of non-party Sedgwick, as an independent insurance adjuster for this investigation. *See id.* ¶ 31. Sedgwick retained an environmental consultant. *See id.* ¶ 35. Haven and

---

[5] Insurers submitted as undisputed facts that "Haven did not pay any amounts to remediate water damage," and "There was no water damage; there was only mold that had to be cleaned/remediated." *See* SUF ¶¶ 72, 73. For reasons discussed in further detail in the Discussion section below, the Court declines to find that these purported facts are undisputed.

its general contractor each retained environmental consultants, Vista Environmental Consulting

("Vista") and Hillman Consulting ("Hillman"). *See id.* ¶¶ 33, 34. Non-party Envirocheck was also

hired as an environmental consultant, and Insurers approved of this hiring.[6] *See id.* ¶¶ 96, 97.

Envirocheck prepared a report that stated that Envirocheck found "visible water damage," including

"rippling," in some buildings at the Property.[7] *See id.* ¶¶ 96, 97; *see also* ECF No. 67-26 at 17–18.

Insurers determined that "mold growth" was not covered under the Policies, and that the

extension of coverage for mold did not apply because there was no covered cause of loss that led to

the mold. *See id.* ¶¶ 127, 128.

### III.    **Applicable Law**

Summary judgment should be granted if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists &

Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A court must view the facts and draw inferences in the manner most favorable to the non-

moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil

Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). "A moving party without the ultimate burden of

persuasion at trial—usually, but not always, a defendant—has both the initial burden of production

and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine

Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry its burden of production, the

moving party must either: (1) produce evidence negating an essential element of the nonmoving

---

[6] The SUF does not make clear who hired Envirocheck and does not specify the name of the environmental
consultant hired by Sedgwick. *See* SUF ¶¶ 35, 96, 97. Haven describes Environcheck as hired by Insurer's
consultant, which Insurers do not specifically dispute. *See* SUF ¶ 96.

[7] Insurers object that Envirocheck's report is hearsay and argue that these quotes are lacking in context and
unrelated to the damage at issue, but do not dispute the facts that Envirocheck prepared a report and the report
contained these quotes. *See* SUF ¶¶ 96, 97. The Court will address Insurer's hearsay objection in considering
whether this fact may be relied upon in the Discussion section of this Order.

1  party's claim or defense; or (2) show that there is an absence of evidence to support the nonmoving

2  party's case. *Id.*

3      Where a moving party fails to carry its initial burden of production, the nonmoving party has

4  no obligation to produce anything, even if the nonmoving party would have the ultimate burden of

5  persuasion at trial. *Id.* at 1102–03. In such cases, the nonmoving party may defeat the motion for

6  summary judgment without producing anything. *Id.* at 1103. However, if a moving party carries its

7  burden of production, the burden shifts to the nonmoving party to produce evidence showing a

8  genuine dispute of material fact for trial. *Anderson*, 477 U.S. at 248–49. Under these circumstances,

9  the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the

10  depositions, answers to interrogatories, and admissions on file, designate specific facts showing that

11  there is no genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal

12  quotation marks omitted). If the nonmoving party fails to produce enough evidence to create a

13  genuine issue of material fact, the motion for summary judgment shall be granted. *Id.* at 322 ("Rule

14  56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion,

15  against a party who fails to make a showing sufficient to establish the existence of an element

16  essential to that party's case, and on which that party will bear the burden of proof at trial.").

17      A party cannot create a genuine issue of material fact simply by making assertions in its

18  legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235,

19  1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for

20  the dispute. *See id.* "If a party fails to properly support an assertion of fact or fails to properly

21  address another party's assertion of fact . . . the court may . . . consider the fact undisputed." Fed. R.

22  Civ. P. 56(e)(2). The Court need not "comb the record" looking for other evidence; it is only

23  required to consider evidence set forth in the moving and opposing papers and the portions of the

24  record cited therein. *Id.* 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir.

25  2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be

26  insufficient; there must be evidence on which the jury could reasonably find for [the opposing

27  party]." *Anderson*, 477 U.S. at 252.   To carry its ultimate burden of persuasion on the motion, the

28

1  moving party must demonstrate that there is no genuine issue of material fact for trial. *Nissan Fire*,

2  210 F.3d at 1102; *Celotex Corp.*, 477 U.S. at 323.

3  **IV.**    **Discussion**

4  At the outset, the Court notes that the parties do not appear to dispute the cause of the mold.

5  There is no dispute that the mold occurred because Gypcrete was installed and not given sufficient

6  time and ventilation to dry before the cabinets were installed. *See* SUF ¶¶ 55–64. The parties

7  characterize these facts differently—Insurers argue that the mold was caused by humidity in the

8  building and Haven argues that the mold was caused by "the general contractor's failure to dry the

9  gypcrete before cabinetry installation" (*see, e.g.*, SUF ¶ 64)—but neither party disputes the basic

10  sequence of events that led to the mold or that the elevated moisture levels from the not-yet-dried

11  Gypcrete caused the mold.

12  "California courts interpret insurance contracts under the ordinary rules of contractual

13  interpretation." *Los Angeles Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017). Courts

14  generally should "interpret coverage clauses in insurance contracts 'broadly so as to afford the

15  greatest possible protection to the insured.'" *Id.* at 801 (quoting *Aroa Mktg., Inc. v. Hartford Ins. Co.*

16  *of Midwest*, 198 Cal. App. 4th 781, 787 (2011)). In contrast, courts should "interpret exclusionary

17  clauses narrowly against the insurer." *Id.* (internal alterations omitted). However, "the burden is on

18  the insured to bring the claim within the basic scope of coverage, and (unlike exclusions) courts will

19  not indulge in a forced construction of the policy's insuring clause to bring a claim within the

20  policy's coverage." *Rosen v. Nations Title Ins. Co.*, 56 Cal. App. 4th 1489, 1497 (1997), *as modified*

21  (Aug. 12, 1997). "To prevail, the insured must prove the existence of a potential for coverage, while

22  the insurer must establish the absence of any such potential." *Id.*

23  **A. The "dampness of the atmosphere" exclusion does not bar coverage.**

24  Insurers' first argument is that Haven cannot establish that its losses were within the scope of

25  coverage, because, per Insurers, the cause of the losses was the damp atmosphere. *See* Am. Mot. at

26  14–18. Insurers emphasize that Haven has not disclosed an expert on the cause of the mold (a

27  question which Insurers argues will require expert testimony), and therefore argue that Haven cannot

28

show that the cause was *not* the damp atmosphere, which would be excluded. This argument

misstates the relevant burdens.

At the outset, Haven must establish that its losses were "within the basic scope of coverage."

*Rosen*. 56 Cal. App. 4th at 1497. Once this is shown, it is *Insurer's burden* to show that an exclusion

applies. *See id.* Insurer's argument focuses on the second part of this—they argue that Haven has no

evidence to prove that the exclusion does not apply. But Haven is not obligated to prove this. Haven

simply must show that the loss was within the basic scope of the agreement, and then Insurers must

show that the exclusion applies. And so, even if the Court were to accept Insurers' interpretation of

the "dampness of atmosphere" exclusion, the fact that Haven has not disclosed an expert to rebut

Insurers' experts does not necessarily mean Haven cannot meet its burdens.

There appears to be no dispute that the losses were within the basic scope of coverage. A

covered loss is any "Accidental loss or damage." *See* SUF ¶ 77. Insurers do not argue that no loss

occurred or that the losses were outside the coverage period. Insurers cite to *MRI Healthcare Center

of Glendale, Inc. v. State Farm Gen. Ins. Co.*, 187 Cal. App. 4th 766 (2010), to argue that Haven

cannot prove a loss occurred, but *MRI Healthcare* is inapposite. There, the court found that where a

machine failed but was not physically damaged, there was no loss. *See MRI Healthcare*, 187 Cal.

App. 4th at 780 ("For there to be a 'loss' within the meaning of the policy, some external force must

have acted upon the insured property to cause a physical change in the condition of the property, i.e.,

it must have been 'damaged'"). But here, there is no doubt that the Haven's property was physically

changed and damaged—the cabinets and building materials developed mold. This was a loss. The

Court finds that Haven has met its initial burden.

If Insurers seek to prevail on the theory that all losses are excluded by the "dampness of

atmosphere" exclusion, they bear the burden of proving as such. *See Rosen*. 56 Cal. App. 4th at

1497. And the exclusion must be interpreted "narrowly against the insurer." *Los Angeles Lakers*, 869

F.3d at 801.

With these principles in mind, the Court finds that the "dampness of atmosphere" does not

exclude coverage for all losses here. The term "dampness of the atmosphere" is susceptible to

1    multiple reasonable readings.[8] On the one hand, it could be interpreted to mean, as Insurers urge,

2    localized conditions of high humidity, including high humidity in a single building or room. This

3    definition finds some support in Merriam-Webster's dictionary, which gives as an example for its

4    third definition of atmosphere, the "stuffy atmosphere" of a room. *See supra* n.8. However, another

5    definition is also reasonable—atmosphere could be read as describing the broader atmospheric

6    conditions of an area. In other words, atmosphere can be interpreted to refer to the weather, as

7    opposed to humidity of a specific building due to poor ventilation. This finds support in the first and

8    second definitions in Merriam-Webster's dictionary.[9] *See supra* n.8. Because both definitions are

9    reasonable, the Court will construe this exclusion against Insurers using the narrower definition. *See*

10   *Los Angeles Lakers*, 869 F.3d at 801. The Court therefore finds that Insurers cannot meet their

11   burden of showing this exclusion, when construed narrowly, applies.

12   　　Further, even if the Court were to accept Insurers' definition, there is evidence that at least

13   some losses were not caused by the dampness of the air in the room. A report prepared by

14   Envirocheck, a company Insurers hired, found evidence of water damage and ripples in some

15   areas.[10] *See* SUF ¶¶ 96, 97; *see also* ECF No. 67-26 at 17–18. Insurers have not shown that, to the

16   extent there was water damage (as opposed to mold only), such damage was caused by humidity as

17   opposed to direct contact with water.

18

19   ───────────────

20   [8] Merriam-Webster's dictionary defines "atmosphere" as: (1)(A) the gaseous envelope of a celestial body
     (such as a planet);" (1)(B) "the whole mass of air surrounding the earth;" or (2) "the air of a locality," e.g.,

21   "the stuffy *atmosphere* of the waiting room." *See Atmosphere*, MERRIAM-WEBSTER, https://www.merriam-
     webster.com/dictionary/atmosphere (last accessed April 25, 2024).

22   [9] The Court relies heavily on dictionary definitions in this case because neither party has offered evidence

23   regarding the parties' intent when this term was written.

24   [10] Insurers argue that this should be excluded as hearsay. This objection misunderstands the evidentiary
     standards on a motion for summary judgment. Evidence need not be presented in a form that is admissible, so

25   long as the contents could be admissible. *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("It
     would be sufficient if the contents of the [document] are admissible at trial, even if the [document] itself may

26   be inadmissible. At the summary judgment stage, we do not focus on the admissibility of the evidence's form.
     We instead focus on the admissibility of its contents . . . [the author] could testify to all the relevant portions

27   of the diary from [the author's] personal knowledge."). Here, although the report may constitute hearsay, it is
     possible that Haven could call its author as a witness, and that individual could testify that he or she found

28   water damage and rippling. By presenting evidence that the report exists, Haven has created a triable issue of
     fact regarding whether there was water damage, even if the report would not itself be admissible.

1    Insurers argued at the hearing that the only damage claimed in writing in Haven's claim was

2    for *mold* remediation, and that all of the costs incurred were for *mold* remediation and not for

3    remediating any *water* damage.[11] Per Insurers, it does not matter whether there was any water

4    damage, it matters only whether Haven incurred costs for addressing such damage, and the evidence

5    suggests Haven did not incur any such costs for water damage. This is an oversimplification of the

6    facts of this case. A jury could review the evidence and conclude that the generalized invoices for

7    "mold remediation" included costs incurred for related issues, including water damage, and that

8    costs were therefore incurred for water damage.[12] Such a finding would be supported by the

9    evidence discussed above that there was water damage to some of the cabinets that were removed.[13]

10   Although the Court understands that Insurer's position is that a plethora of other evidence shows

11   there was mold damage only, because there is evidence pointing each direction, a jury must decide

12   this issue. Thus, even if the Court were to accept that the Policies excluded damage caused by

---

15   [11] Some evidence suggests that this claim by Insurers—that the only damage claimed was for mold
16   remediation only and not other costs—is not correct. For example, on November 15, 2021, while Insurers
     were still investigating the claim, Haven's counsel sent a letter to insurers explicitly stating that Haven was
17   seeking coverage for water damage. *See* ECF No. 67-23 at 3. While Insurers may argue that this claim was
     raised too late or was otherwise improper, it appears to refute the idea that Haven has only ever sought to be
18   reimbursed for costs incurred for mold remediation.

19   [12] At the hearing, Insurers argued that even if the Court were to assume that certain damages were caused by
     water damage, it would not be appropriate to show the jury evidence of "co-mingled damages" (that is,
20   evidence showing some damage from fungus and other damage from water) that does not differentiate
     between the two. Per Insurers, it would be highly prejudicial to allow the jury to review evidence a large total
21   damages amount that includes some excluded damages and does not differentiate between covered and
     excluded damages. Insurers provided no citation for this argument at the hearing, and did not address it in the
22   written briefing.

23   To the extent that Insurers are correct that the law excludes such evidence, this would be properly addressed
     through a motion *in limine* and not on this motion. Insurers have not shown that evidence of water damage
24   cannot be presented in *any* admissible form, and because the Court finds that there is some potentially
     admissible evidence of water damage, Haven has met its burden on this Motion. *See Fraser*, 342 F.3d at 1036
25   (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form.
     We instead focus on the admissibility of its contents").

26   [13] Haven also argues that some evidence suggests that certain damage may have been caused by "mucking"—
     a process of cleaning gypcrete by using large amounts of water—and this provides additional evidence of
27   water damage. *See* SUF ¶ 110. Insurers argue that no admissible evidence supports Haven's theory that
     mucking occurred or caused damages. The Court need not reach this issue, as the Court has already identified
28   other evidence from which a jury could find water damage.

moisture in the air of a given building or room, there would still be a triable issue of fact on whether *all* losses were excluded.

In sum, the Court finds that Insurers have not shown that all losses were excluded by the "dampness in the atmosphere" exclusion, both because the Court reads that exclusion as limited to dampness in the broader atmosphere as opposed to in a confined space, and because the Court finds a triable issue of fact as to whether all losses were caused by moisture in the air as opposed to direct contact with water.

**B.  There are triable issues of fact regarding whether the Fungus Extension applies.**

Insurer's second argument is that the limited Fungus Extension does not apply because there was no underlying "occurrence" covered by the Policies. The Court finds that Insurers are correct that this extension requires an underlying covered "occurrence," but finds that there are triable issues of fact regarding whether there was such an "occurrence."

The Policies generally *exclude* mold damage through the Fungus Exclusion,[14] which makes clear that Policies will not cover losses "consisting of, caused by, contributed to, or aggravated by" fungus. *See* SUF ¶ 79. However, the Policies also *extend* limited coverage for mold losses through the Fungus Extension, which provides up to $1 million of coverage for "Direct physical LOSS to insured property at the INSURED PROJECT caused by FUNGUS." *See* SUF ¶ 82. This coverage only applies where the fungus "results directly from an OCCURRENCE that is covered by this Policy." *See id.* Haven's position is that while it is *not* entitled to full coverage for its mold losses (pursuant to the Fungus Exception), it *is* entitled to $1 million in coverage for mold losses under the Fungal Extension. Insurers argue that because there was no underlying "occurrence" that caused the mold, the Fungus Extension does not apply.

As discussed above, the Policies define an OCCURRENCE as "All LOSS attributable directly or indirectly to one originating cause, event, incident or repeated exposure [to the same]."[15]

---

[14] The parties do not dispute that mold is a fungus within the meaning of FUNGUS as defined by the policies.

[15] Insurers at times assert that an "Occurrence" is a "particular originating cause." *See, e.g.*, Am. Mot. at 33. This is incorrect. Rather, as described above, an "Occurrence" is *all loss* attributable to a particular originating cause—the occurrence is the *loss*, not the underlying cause. *See* ECF No. 67-4 at 42.

ECF No. 67-4 at 42. The Policies further state that "All such LOSS will be treated as one OCCURRENCE, unless a specific period of time is included in this Policy." *See id.* The key issue in determining whether the Mold Exclusion applies is whether there was an "occurrence" that led to the mold.

As Haven notes, the definition of "occurrence" does not limit occurrences to those covered by the Policies. *See id.*; *see also* Am. Mot. at 29. However, the Fungus Extension makes clear that for the Fungus Extension to apply, there must be an occurrence *"covered by the Polic[ies]"* that resulted directly in the fungus.

Haven bears the burden of showing that its losses were within the scope of coverage. *See Rosen*. 56 Cal. App. 4th at 1497. Because the provision at issue is an *extension*, rather than an *exclusion* of coverage, it is not Insurer's burden to show that the extension does not apply, and rather is Haven's burden to show that the extension does apply. *See id.* However, the Court should still interpret this extension "broadly so as to afford the greatest possible protection to the insured." *Los Angeles Lakers*, 869 F.3d at 800. Haven argues that no underlying covered occurrence is necessary, and that the Policies simply cover mold damage up to $1 million.

The Court finds that Haven's argument is contrary to the plain language of the Policies—there must be an occurrence—that is, a loss of some kind—that is covered by the Policies, and which directly resulted in mold, for the mold extension to apply. It is not enough that mold existed. There must be some other loss that the Policies covered that led to the mold.

However, the Court does not find, as Insurers urge, that the undisputed evidence shows there was no such loss. First, as discussed above, there is some evidence suggesting there was water damage other than the mold, which could be construed as an occurrence. Insurers have not submitted evidence that disproves the possibility that this water damage, or the underlying issues related to it, directly resulted in the mold. Alternatively, as discussed in further detail below, there are triable issues of fact regarding whether the error of installing the cabinets without allowing the Gypcrete to dry might be a covered occurrence. There remain open questions regarding whether this construction error can be itself construed as a covered loss. If a jury finds that this error was a covered occurrence, then it could also find that the mold resulted from that error.

1    Thus, the Court holds that Haven will need to show that some covered occurrence directly

2    resulted in the mold for the Fungus Extension to apply, but will not grant summary judgment to

3    Insurers on the argument that Haven cannot do so, because the undisputed evidence does not

4    establish that Haven will be unable to show a covered loss that resulted in the mold.

5        **C. There are triable issues of fact regarding whether the Cost of Making Good
           exception bars coverage.**
6

7    Insurer's third argument is that the COMG Exclusion bars coverage for all of Haven's losses,

8    because Haven's losses are equivalent to the costs that Haven would have incurred if Haven had

9    rectified the issues immediately before the losses occurred. Haven disputes the interpretation of the

10   COMG Exclusion and argues that Insurers have not properly calculated which costs are excluded.

11   The Court finds that Insurer's interpretation of the COMG exclusion is correct, but that there are

12   triable issues of fact regarding whether it bars coverage for all losses.

13   Because the COMG exclusion is an exclusion, it should be interpreted "narrowly against the

14   insurer" as discussed above. *See Los Angeles Lakers*, 869 F.3d at 801. Insurers bear the burden of

15   showing it applies. *See id.*

16   The COMG Exclusion bars "The costs that would have been incurred to rectify" "[f]ault,

17   defect, error, deficiency or omission in design, plans, specifications, engineering or surveying" or

18   "[f]aulty or defective workmanship, supplies or material," if "such rectification been effected

19   immediately prior to the LOSS." *See* SUF ¶ 83. The Court finds that this clause is not

20   ambiguous[16]—if errors in "design, plans, specifications, engineering or surveying," or faulty or

21   defective workmanship, caused a loss, then the loss is not covered to the extent that the loss is

22

23   _____

24   [16] Haven makes extensive arguments about the history and meaning of similar but distinct clauses. The Court
     finds this argument inapposite—the Court should apply typical principles of contract interpretation to
25   insurance policies, including the principle that, where possible, the intent of the parties' and therefore the
     policy's meaning should be determined "solely from the written provisions of the insurance policy." *See Los*
26   *Angeles Lakers*, 869 F.3d at 801.

     Insurers assert without a specific citation that the Policies are an integrated agreement. *See* Am. Mot. at 47. In
27   reviewing the Chubb Policy, the Court does not find any integration clause. Nevertheless, the Court finds it
     appropriate to determine the meaning of the unambiguous COMG Exception based on its text without
28   reliance on sources that discuss related but distinct clauses.

1  equivalent to the costs that would have been incurred if the issues were rectified immediately before

2  the loss. *See id.* But pursuant to the general rules governing exclusions, it will be Insurer's burden to

3  demonstrate this exclusion applies to relevant losses.

4        First, Insurers have not shown that the installation of cabinets and other materials before the

5  Gypcrete had dried falls within the COMG exclusion at all. The Court sees no evidence that this was

6  an error in "design, plans, specifications, engineering or surveying." Insurers have not submitted

7  evidence that the "design" of the Project included installing cabinets before the Gypcrete had dried,

8  nor have they submitted evidence of any error in any written plans or specifications. The evidence

9  also suggests that the cabinets were not installed improperly and were not defective. *See* SUF ¶ 105;

10  *see also* ECF No.67-27 at 17–19. Although it appears that an error of some kind was made, it is not

11  clear from the evidence submitted that this error falls within any of the categories listed in the

12  COMG Exclusion. Construing the exclusion narrowly, as the Court must, *see Los Angeles Lakers*,

13  869 F.3d at 800, the Court finds that the undisputed evidence does not show the Exclusion applies.

14        Second, even if the Court were to find that the error in question triggered the application of

15  the COMG Exclusion, Insurers have not shown that the Exclusion would bar coverage as to all

16  losses. To determine which losses (if any) are excluded by the COMG exclusion, the trier of fact

17  would need to compare "[t]he costs that would have been incurred to rectify" this error if "such

18  rectification been effected immediately prior to the LOSS" with the costs that Haven actually

19  incurred. *See* SUF ¶ 83. This analysis would require multiple steps—first confirming that it would

20  have been possible to rectify the issues "immediately prior" to the loss, second determining the costs

21  of hypothetical rectification prior to the loss, third determining the costs actually incurred, and

22  finally comparing the two costs to determine how much of the total loss should be excluded. For the

23  COMG Exclusion to bar all losses (assuming it applies to the error in question in the first instance),

24  Insurers would need to show that these two amounts—the costs of pre-mold hypothetical

25  remediation and the post-mold actual remediation—are equal and amount to the sum total of

26  Haven's losses.

27        Insurers have not shown this. Insurers attempt to short circuit the multistep analysis described

28  above. Per Insurers, mold does not grow instantaneously, and so there must have been some moment

after the cabinets were installed but prior to the mold where the cabinets could have been removed, and because the later remediation work was simply removing the cabinets, the costs of hypothetical remediation must be equal to the full cost of later remediation. *See* Am. Mot. at 32–34. The Court finds this chain of reasoning and the evidence cited in support of it to be an inadequate analysis of the questions described above. First, although Insurers have shown that there theoretically should have been a moment after the cabinets were installed but before the mold developed when remediation could have been done, they have not actually shown that remediation would be feasible. It is possible that removing the cabinets might not have been able to occur quickly enough to actually avoid mold issues. Second, Insurers have not attempted to quantify (or at least not informed the Court of attempts to quantify) what the hypothetical remediation costs prior to the mold would have been. It is possible that although both the pre-mold hypothetical remediation and the post-mold actual remediation involved similar work of removing the cabinets, these remediations might cost different amounts, as the mold and efforts to rid the buildings of it might have added costs. And third, because Insurers have not quantified the costs of the hypothetical pre-mold remediation, they have been unable to compare it to the actual remediation costs. Insurers have not met their burden of showing that undisputed facts demonstrate that all of Haven's losses are excluded by the COMG Exclusion.

Thus, the Court will not grant Insurers summary judgment on the grounds that COMG Exclusion bars all losses.

### D. There are triable issues of fact regarding whether there is coverage for project delays.

Insurer's next argument is that despite the extension of coverage for Delays in Opening, Haven is not entitled to coverage for such losses, because this coverage only extends where there is an underlying occurrence. *See* Mot. at 39. This argument fails for the same reason that the arguments regarding the Fungus Extension did.

The coverage extension for delays only applies where delays are "caused by an OCCURRENCE" that is covered by the Policies. *See* SUF ¶ 88. This language is similar to that in the Fungus Extension. As with the Fungus Extension, there are triable issues of fact regarding

whether there was an underlying occurrence that would be covered. Thus, the Court will not grant summary judgment on this ground.

### E.  The Court will not grant summary judgment as to the contract claims.

Insurers argue that the Court should grant summary judgment regarding the claims related to the Policies and purported breach thereof (causes of action one through five). Pursuant to the discussion above, the Court will not do so. There are triable issues of fact regarding whether Haven was entitled to coverage. As to the first cause of action—declaratory relief that certain of Haven's losses fall outside the scope of the Fungus Exclusion—the Court found above that there are triable issues of fact regarding whether certain losses are outside the scope of that exception. As to the second—for declaratory relief that the Claim falls within the Mold Coverage Extension—the Court also found triable issues of fact. So, too, for the third cause of action—for declaratory relief that the Claim falls within the coverage afforded for Delay in Opening. And because of these triable issues of fact, there are also triable issues of fact regarding whether Insurers breached the contract by failing to pay the claim (fourth cause of action) and failing to pay for delays (fifth causes of action).

### F.  Insurers are not entitled to summary judgment as to the claim for breach of implied covenant of good faith and fair dealing (sixth cause of action), but are entitled to summary judgment as to Haven's request for punitive damages

Insurers' final argument is that the Court should grant summary judgment as to the sixth cause of action for breach of the implied covenant of good faith and fair dealing, including both the claim as a whole and Haven's request for punitive damages. *See* Am. Mot. at 46–49. For the reasons discussed below, the Court finds that Insurers are not entitled to summary judgment on this claim as whole, but are entitled to summary judgment as to the request for punitive damages.

ii.    <u>Insurers are not entitled to summary judgment as to the sixth cause of action as a whole.</u>

A claim for breach of the implied covenant of good faith and fair dealing against an insurer requires the plaintiff to show: "(1) benefits due under the policy were withheld; and (2) the reason for withholding benefits was unreasonable or without proper cause." *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001).

1    Insurers first argue that summary judgment should be granted on this claim because there

2    was no underlying breach of contract and no benefits were ever due. This argument fails for the

3    reasons discussed above—there are triable issues of fact regarding whether benefits were due and

4    whether there was a breach of contract.

5    Insurers argue in the alternative that even if there is a dispute as to breach of contract,

6    Insurers are still entitled to summary judgment as to the final claim because there was a good faith

7    dispute. "Under California law, a bad faith claim can be dismissed on summary judgment if the

8    defendant can show that there was a genuine dispute as to coverage." *Id.* This rule should be applied

9    on a "case-by-case basis." *Id.* It applies to disputes on the meaning of the policy, and also applies in

10    some cases to disputes regarding factual issues. *See id.*

11    Here, the parties disputed not only the meaning of the relevant Policies, but also the facts of

12    what occurred. In its Motion, Insurers repeatedly asserted that there is no evidence of any water

13    damage, a position which appears consistent with the position Insurers took throughout the

14    investigation process. *See, e.g.*, Am. Mot. at 5, 23; *see also* ECF No. 67-3 ¶¶ 18–20. But the

15    evidence before the Court suggests that an environmental consultant *hired by Insurers* found

16    evidence of water damage. *See* SUF ¶¶ 96, 97; *see also* ECF No. 67-26 at 17–18. This, in

17    combination with other circumstantial evidence regarding Insurers' investigation (e.g., the fact that

18    Insurers' investigator did not perform a coverage analysis, which Insurers argue is misleading but do

19    not dispute, *see* SUF ¶ 126), could lead to a finding that Insurers ignored facts that were not

20    convenient to their position. Because the parties disputed not just policy language, but also the facts,

21    the Court is not inclined to grant summary judgment on the bad faith claim at this stage. With the

22    breach of contract claim unresolved, and with significant disputes of fact remaining that may bear

23    upon on the bad faith claim, the bad faith claim should be decided by the jury.

24            ii.    <u>Insurers are entitled to summary judgment as to punitive damages.</u>

25    Haven seeks punitive damages as part of its sixth cause of action. *See* Compl. at Prayer for

26    Relief. Insurers argue that they are entitled to summary judgment as to punitive damages. *See* Am.

27    Mot. at 47. Haven did not attempt to rebut this argument in its briefing, and at the hearing, Haven

28    conceded that it had no evidence that would support a finding of punitive damages (while arguing

that it nevertheless had evidence that could support a finding of liability as to the claim for breach of the implied covenant of good faith and fair dealing).

Under California law, a plaintiff may recover punitive damages against an insurer "when the insurer breaches the covenant of good faith and fair dealing and is 'guilty of oppression, fraud or malice.'" *Lunsford v. Am. Guarantee & Liab. Ins. Co.*, 18 F.3d 653, 656 (9th Cir. 1994). The Court sees no evidence in the record that could support such a finding. Based on the lack of evidence, and Haven's concession at the hearing, the Court will grant summary judgment to insurers as to the request for punitive damages.

## V.    Conclusion

For the reasons stated herein, the Court ORDERS as follows:

1.  The Motion for Summary Judgment is DENIED as to all causes of action.

2.  The Motion for Summary Judgment is GRANTED as to Haven's request for punitive damages.


IT IS SO ORDERED.

Dated: September 27, 2024    _____

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge